**IN THE COURT OF APPEALS OF IOWA**

No. 20-1353
Filed October 20, 2021

**McKINNON Q. PANGBURN,**
    Plaintiff-Appellant,

**vs.**

**ROOKIES, INC. d/b/a ROOKIES SPORTS BAR,**
    Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Scott County, Stuart P. Werling,

Judge.

        McKinnon Q. Pangburn appeals from grants of summary judgment for

defendant Rookies, Inc. **AFFIRMED IN PART, REVERSED IN PART, AND**

**REMANDED.**

        Sharbel A. Rantisi of Rantisi Law LLC, Peoria, Illinois, for appellant.

        Amanda M. Richards of Betty, Neuman & McMahon, P.L.C., Davenport, and

Jace T. Bisgard and Megan R. Merritt of Shuttleworth & Ingersoll, Cedar Rapids,

for appellee.

        Considered by Tabor, P.J., and Greer and Badding, JJ.

**TABOR, Presiding Judge.**

After a birthday-celebration-gone-wrong, Anthony Keckler assaulted McKinnon Q. Pangburn. Injured and seeking redress, Pangburn filed dram shop and premises liability actions against Rookies Sports Bar. The district court granted summary judgment on both claims. Because the court applied the wrong legal standard on the dram shop claim, we reverse. But the record does not present a jury question on the premises liability claim, so we affirm the grant of summary judgment.

## I. Facts and Prior Proceedings

In March 2017, Devin Allison turned twenty-one years old. Like many people his age, Allison wanted to celebrate this milestone. So he gathered a group of friends, intent on making it a night to remember. But the night took an unexpected turn. And some patrons leaving Rookies Sports Bar encountered trouble in the parking lot.

Rookies offered a unique deal for its newly-of-age patrons. Come in on your twenty-first birthday—or a few days in either direction—and for only $21, you get twenty-one thirty-two-ounce pitchers of beer.[1] Enticed, Allison's group handed over $21, and the tap started flowing. And because the deal was so good they did it twice, ordering a second round of pitchers after midnight.

---

[1] Patrons could choose eleven standard sized (sixty-four-ounce) pitchers instead of twenty-one small pitchers.

Given it was his birthday, Allison wasn't buying. Instead, his friend Brandon Rheingans did. Rheingans went to the bar, ordered the deal, and paid for the pitchers. He also shuttled the beer to the table, two pitchers at a time.[2]

Beer aplenty, the group celebrated. Among Allison's ten friends on hand to celebrate was Anthony Keckler. And although Keckler did not buy the beer, he did help himself to the pitchers, eventually becoming intoxicated. In his intoxicated state, Keckler grew loud and rude, confronting another of Allison's friends.

But that wasn't the last confrontation Keckler would find himself in. As the night neared its end, a fight broke out in Rookies's parking lot after a man urinated on the tire of a parked car.[3] Despite having no connection to the dispute, more than a dozen other patrons—including Keckler—joined in the brawl.

Although unknown to him, Keckler directed his assault at McKinnon Pangburn. He pushed Pangburn to the ground. Then Keckler yelled: "I'm from Alabama bitch," while kicking Pangburn in the head. The assault caused Pangburn serious injuries, including a nasal fracture, a cranial fracture, and permanent brain damage. For his role, Keckler pleaded guilty to assault causing serious injury and was sentenced to an indeterminate five-year prison sentence.

Pangburn sued Rookies, bringing dram shop and premises liability claims. In moving for summary judgment on the dram shop count, Rookies alleged its employees did not sell or serve beer to Keckler.[4] During depositions, Keckler,

---

[2] When the pitchers were empty, Rheingans returned them to the bar and received refills. The bar kept a tally of how many pitchers were outstanding.
[3] The men involved in the original confrontation are not a part of this lawsuit.
[4] The bar filed two separate motions for partial summary judgment because it was represented by different law firms on the dram shop and premises liability counts.

others in his group, and Rookies bartenders testified that Keckler only drank from the pitchers that Rheingans bought and brought to the table. But their testimony had limitations. For instance, despite his certainty at deposition, right after the fight Keckler had memory issues as he spoke to police. And one of the bartenders acknowledged the "possibility" that she had served Keckler.[5]

As for the premises liability claim, the parties focused on the bar's security. Video footage from inside the bar showed bouncers leaving their post, allowing patrons to freely exit Rookies with drinks in hand, and failing to intervene during a verbal dispute between two patrons. Rookies also moved for summary judgment on that count, alleging no breach of duty because Keckler's attack on Pangburn outside the bar was not foreseeable.

The district court granted summary judgment on both claims. Pangburn now appeals.

## II. Standard of Review

We review grants of summary judgment for errors at law. *Smith v. Shagnasty's Inc.*, 688 N.W.2d 67, 71 (Iowa 2004). On appeal, we review the record in the light most favorable to the nonmoving party. *Bill Grunder's Sons Const. Inc. v. Ganzer*, 686 N.W.2d 193, 196 (Iowa 2004). If the district court correctly applied the law and there was no genuine issue of material fact, we affirm. *Id.* We consider an issue to be material if its determination affects the suit's

---

[5] Aside from acknowledging that "possibility," the bartender admitted drinking on the job. Within an hour, she had five shots, as well as sips from customers' beers.

outcome. *Id.* And the dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Id.*

**III.   Analysis**

**A.   Dram Shop**

At the heart of this dispute is the phrase "sold and served." On appeal, the parties disagree (1) on the precise meaning of "sold and served" and (2) whether there was a genuine dispute that Rookies employees sold and served alcohol to Keckler. Because the legal standard determines which facts are pertinent, we begin with the law.

The dram shop statute—a subsection of the Iowa Alcoholic Beverage Control Act—"place[s] the hand of restraint" on those authorized to sell alcohol. *Thorp v. Casey's Gen. Stores, Inc.*, 446 N.W.2d 457, 467 (Iowa 1989) (quoting *Atkins v. Baxter*, 423 N.W.2d 6, 9 (Iowa 1988)). At the time of these events, the statute provided:

> Any person who is injured . . . by an intoxicated person . . . has a right of action . . . against any licensee or permittee . . . who sold and served any beer, wine, or intoxicating liquor to the intoxicated person when the licensee or permittee knew or should have known the person was intoxicated, or who sold to and served the person to a point where the licensee or permittee knew or should have known the person would become intoxicated.

Iowa Code § 123.92(1)(a) (2017).

The rest of the chapter gave context. Section 123.110 provided: "It shall not be necessary in every case to prove payment in order to prove a sale within the meaning and intent of this chapter." Section 123.3(41) defined "sale" of alcohol as including "procuring or allowing procurement for any other person." And

section 123.1 reminded courts to construe this chapter liberally "for the protection of the welfare, health, peace, morals, and safety of the people of the state."

And based on these statutory mandates, our supreme court has allowed dram shop claims where there was only an *indirect* sale.[6]  For example, in *Sanford v. Fillenwarth*, the court upheld a dram shop claim against a resort that sold "booze cruise" experiences.  863 N.W.2d 286, 292 (Iowa 2015).  Michael Lawler bought the cruise tickets for himself, his wife, and their two adult children.  *Id.* at 288.  As the cruise wore on, his son, James, became intoxicated and assaulted a fellow passenger.  *Id.*  The district court granted summary judgment holding that, as matter of law, a "sale" had not occurred.  *Id.* at 288–89.  But the supreme court disagreed.  *Id.* at 294.  It was unbothered that Michael, not James, bought the alcohol, because the resort "had reason to know that multiple persons were staying in the room with access to and use of all the amenities [including alcohol] in exchange for . . . payment."  *Id.* at 293–94.  Finding that James fell "within the rubric of sale for purposes of this statute," the court reversed.  *Id.* at 294.[7]

---

[6] It's worth noting that the legislature amended the dram shop act since the events of this case.  The act now *explicitly* requires a direct sale and service.  Iowa Code § 123.92 (2018) (imposing liability on establishments that "sold and served any alcoholic beverage directly to the intoxicated person, provided that the person was visibly intoxicated at the time of the sale or service").  That amended language supports our holding that the pre-2018 statute covered indirect sales and service. *See Paul v. Ron Moore Oil Co.*, 487 N.W.2d 337, 338 (Iowa 1992) ("We assume the amendment sought to accomplish some purpose and was not simply a futile exercise of legislative power.").

[7] The district court relied on our unpublished decision in *Hawthorne v. Estate of Krommenhoek,* No. 12-1455, 2013 WL 2637176, at *1 (Iowa Ct. App. June 12, 2013), in which we rejected a dram shop claim because the intoxicated patron's girlfriend bought pitchers of beer for their group.  Notably, that decision predated *Sanford*.

7

Earlier, in *Smith*, the court allowed a dram shop claim to proceed although neither the injured patron nor the server identified the intoxicated party by name. 688 N.W.2d at 73–74. That the intoxicated person ("Jane Doe") was holding a bottle of beer—the same kind that the bar sold—at the time of the attack was enough to satisfy the "sold and served" requirement. *Id.* And the court never inquired into whether someone else might have bought the beer on Doe's behalf.

What's more, extending liability to indirect sales aligned with the dram shop statute's "restraint" function. The statute was meant to encourage responsible business practices. *See Sanford*, 863 N.W.2d at 291–92 ("The legislature did not want to impose liability . . . without [the licensee or permittee] tangibly benefitting . . . [like] when they profit from selling of alcoholic beverages."). Because of this purpose, the act didn't punish "purely gratuitous undertakings." *Summerhays v. Clark*, 509 N.W.2d 748, 751 (Iowa 1993). Instead, *Sanford* endorsed a "pragmatic approach to the meaning of the word 'sale,'" looking for consideration and express or implied payment. 863 N.W.2d at 291. And because bars derive profit even if the sale was indirect, the statute applied to patrons who drank on someone else's tab. *See Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 543 (Iowa 2018) (allowing dram shop action where intoxicated person's bosses bought rounds for their table).

Next we consider the term "served." Rookies again argues Pangburn must have proof of *direct* service to trigger liability. Unlike "sale," the code did not define "served." So we turn to the case law.

In *Paul*, our supreme court considered the word "served" shortly after it was added to the dram shop statute. 487 N.W.2d at 338. The court believed that the

8

legislature intended to narrow the licensees that could be found liable by excluding convenience stores that only sold alcohol. *Id.* The court held "the context within which the word 'served' is used . . . refers to service of the intoxicating beverage rather than service to the customer." *Id.* So the operative question became whether the sale was made "with the intent that [the alcohol] be consumed on the premises." *Kelly v. Sinclair*, 476 N.W.2d 341, 346 (Iowa 1991), *abrogated on other grounds by Thompson v. Kaczinski*, 774 N.W.2d 829, 836 (Iowa 2009). Because Rookies sold the pitchers with the intent that they be consumed on the premises, the "service" element is satisfied.[8]

Having determined that the phrase "sold and served" required neither direct sale nor direct service, we turn to the facts before the district court. Keckler and about nine other friends patronized Rookies for over four hours. During that span, their friend Rheingans bought the 21-for-$21 deal twice, ordering the equivalent of forty-two pitchers of beer.[9] True, Rheingans paid for the beer. But it's undisputed that Keckler partook. Another friend testified she saw him "walking around the bar" holding "two pitchers in his hand at once." And Keckler admitted in his deposition that he was "obviously intoxicated."

Given these undisputed facts, Pangburn presented a genuine issue of material fact whether Rookies employees sold and served beer to Keckler when they knew or reasonably should have known that he was intoxicated or would

---

[8] We also note the bartender's acknowledgment in her deposition that she may have served Keckler alcohol.

[9] Forty-two thirty-two-ounce pitchers equals: 1,344 ounces of beer, 112 standard cans, 84 pints, or 10.5 gallons.

become intoxicated.  So the district court erred in granting summary judgment on dram shop liability.  We reverse and remand on that claim.

### B.    Premises Liability

Beyond the dram shop claim, Pangburn challenges the grant of summary judgment on his premises liability action.  His negligence claim requires proof of four elements: (1) a duty to conform to a standard of conduct to protect others, (2) a failure to conform to that standard, (3) factual cause and scope of liability, and (4) damages.  *See Thompson*, 774 N.W.2d at 839 (adopting formulation from Restatement (Third) of Torts: Liability for Physical and Emotional Harm).

Rookies concedes it owed a special duty of care to Pangburn as a patron. *See Hoyt v. Gutterz Bowl & Lounge L.L.C.*, 829 N.W.2d 772, 775 (Iowa 2013).  But it emphasizes "taverns are not insurers of patrons' safety against third-person criminal attacks."  *See id.* at 777.  From there, Rookies contends the district court was correct in finding, as matter of law, it did not fail to exercise reasonable care. In that reasonable care analysis, Rookies focuses on foreseeability.[10]  It argues the injuries to Pangburn were not foreseeable because the fight occurred in the parking lot and the record revealed no proof that Pangburn and Keckler interacted inside the bar.

To counter, Pangburn argues "only in exceptional cases should the foreseeability issue be determined as a matter of law."  *See id.* at 775

---

[10] "'[T]he assessment of the foreseeability of a risk' is no longer part of the duty analysis in evaluating a tort claim, and instead is to be considered when the fact finder decides whether a defendant has failed to exercise reasonable care."  *Hoyt*, 829 N.W.2d at 774 (quoting *Thompson*, 774 N.W.2d at 835).  Foreseeability is also relevant in the scope-of-liability determination.  *Id.* at 781.

("[A]ssessment of foreseeability should be allocated to the fact finder, as part of its determination of whether appropriate care has been exercised in any given scenario."). And he insists Rookies security failed to prevent the altercation, highlighting Keckler's obvious intoxication and that Rookies staff was inattentive.

On that last point, the district court agreed that Rookies staff did not follow the bar's own policies. Yet the court reduced its analysis to the differences from the summary judgment record in *Hoyt*, finding "the facts at hand are a dramatic departure from the facts that shaped that outcome." The court noted Hoyt had a pre-existing conflict with the third-party attacker and their dispute started inside the bar. *Hoyt*, 829 N.W.2d at 773. By contrast, Keckler and Pangburn were strangers until they fought in the parking lot.

Pangburn blasts the court's reasoning, submitting that "foreseeability does not require that the parties have a prior altercation or relationship." We agree the facts in *Hoyt* are not a prerequisite for finding premises liability. Under the Restatement (Third) a defendant may be held liable for the actions of a third party if the defendant's lack of reasonable care "combines with or permits" the improper conduct of the third party. Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 19, at 215; *see Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 391 (Iowa 2010). Section 19 supplies scenarios showing how a defendant's conduct may contribute to the likelihood of injury by a third person:

> For example, the defendant's conduct may make available to the third party the instrument eventually used by the third party in inflicting harm; or that conduct may bring the plaintiff to a location where the plaintiff is exposed to third-party misconduct; or that conduct may bring the third party to a location that enables the third party to inflict harm on the plaintiff; or the defendant's business operations may create a physical environment where instances of

misconduct are likely to take place; or the defendant's conduct may inadvertently give the third party a motive to act improperly.

Restatement (Third) § 19 cmt. e, at 218.

Seizing on those concepts, Pangburn contends Rookies's business operations created a physical environment where Keckler's misconduct was likely to occur. In his words, "ignoring what is taking place in and around the place of business is not an affirmative defense to the question of foreseeability, particularly following a night of several young people binge drinking in a bar that allowed and encouraged the binge drinking to take place."

Granted, a bar "may play a role in creating the risk." *Hoyt*, 829 N.W.2d at 778 n.6. But it must be a risk that creates a setting where instances of misconduct are *likely* to take place. *See* Restatement (Third) § 19 cmt. g, at 220 ("[T]he law itself must take care to avoid requiring excessive precautions of actors relating to harms that are immediately due to the improper conduct of third parties, even when that improper conduct can be regarded as somewhat foreseeable.").

Searching for that likelihood of third-party misconduct, Pangburn points to the bar staff's lack of vigilance. As an example, he suggests staff failed to intervene when two patrons got into a dispute inside the bar just before midnight. But the video footage undercuts this claim. True, two patrons appeared to have a disagreement.[11] But the encounter included fleeting, if any, physical contact and resolved itself without intervention. Next, Pangburn points to Keckler's

---

[11] Neither Keckler nor Pangburn were involved in this argument. And though possible, there's no indication that the two disputing patrons were involved in the parking-lot melee later that evening.

intoxication, leading him to glad-hand and hug a bouncer whom he never met before. But bar patrons with lowered inhibitions are far from unusual. While Pangburn offered evidence Keckler was loud and rude to another member of the birthday group, the record does not show Keckler was acting aggressively. Neither the staff's inattentiveness nor Keckler's behavior inside the bar supported Pangburn's theory that Rookies's business operation promoted the likelihood of injury by a third person.

Before concluding, we turn to Pangburn's argument that the bar failed to "deescalate the situation" in its parking lot. He contends as tensions were rising outside, the bouncers were not at their post. He asserts "[t]he activity leading up to the assault lasted approximately [seven] minutes; in other words, there was about [seven]-minutes worth of people gathering right outside the main entrance and people seemingly discussing the incident that caused the fight." Trouble is that Pangburn's brief fails to include "references to the pertinent parts of the record" in support of those assertions. Because his omission violates Iowa Rules of Appellate Procedure 6.903(2)(g)(3) and 6.904(4), we find Pangburn waived that portion of his argument.

But even if we could consider whether Rookies failed to exercise reasonable care in supervising its parking lot, no evidence in the summary judgment record supports that theory. Nothing in the record connects any danger brewing outside to the bouncers' absence from their post.[12] And what is presented is too

---

[12] Our record includes only surveillance video from *inside* Rookies. The camera angle captured just a small portion of the parking lot through the front door. Neither the brawl nor the crowd is ever in frame; only a parked car, patrons entering and

speculative to survive summary judgment. *See Banwart*, 910 N.W.2d at 545 (reiterating standard that nonmoving party must set forth specific facts showing the existence of a genuine issue for trial).

The district court was correct in finding Pangburn failed to establish his premises liability claim as a matter of law. But genuine issues of material fact remain for Pangburn's dram shop claim. Thus summary judgment was improper. We reverse in part and remand for trial on that claim.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

exiting, and some shadows are visible. At the summary judgment hearing, defense counsel said Rookies had video "that shows their parking lot, and . . . [at the] corner of that video, you can see the altercation start." Indeed, a still photo taken from outside video footage was submitted with the exhibits from Keckler's criminal case. But that video was not submitted as part of the record on appeal. Thus we cannot speculate about the diligence of Rookies staff in responding to the simmering unrest in the parking lot.